**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **: CRIMINAL NO. 23-215-5** |
| | **:** |
| **vs.** | **:** |
| | **:** |
| **KEYONN VINCENT** | **: HON. KELLEY BRISBON HODGE** |

<u>**DEFENDANT KEYONN VINCENT'S SENTENCING MEMORANDUM**</u>

**I. INTRODUCTION**

Defendant Keyonn Vincent, now twenty-four years old, appears before the Court having pled guilty to an extremely serious set of offenses, including a murder in furtherance of a crime of violence, in which a life was tragically taken. Mr. Vincent accepts full responsibility for his conduct, expresses deep remorse and does not seek in any way to diminish the harm suffered by the victim or his family.

At the same time, 18 U.S.C. §3553(a) requires the Court to impose a sentence that is individualized and proportionate—that is, "sufficient, but not greater than necessary." When applied to the person standing before this Court, the §3553(a) factors reveal a defendant who has endured some of the most severe childhood trauma imaginable: prenatal substance exposure, abandonment, removal from parental custody, years of foster-care instability, adoption into a home marked by physical violence, food deprivation, and emotional cruelty, the sexual abuse and impregnation of his sister by their adoptive father, homelessness as a minor, multiple institutional placements, inadequately or untreated bipolar and/or schizophrenia disorder and trauma, and a complete absence of healthy adult relationships or adult guidance.

These circumstances do not excuse the offense. But they explain why Mr. Vincent's development, and ultimately his culpability, are drastically different from the average

defendant facing a guideline range of this magnitude. For all the reasons set forth below, a sentence significantly below the applicable guideline range is appropriate and fully consistent with the statutory command of parsimony.

For the reasons set forth below, Mr. Vincent requests this Court vary below the applicable guideline sentencing range.

## II.     PROCEDURAL BACKGROUND

On June 26, 2024, Mr. Vincent pleaded guilty to Counts One, Two, Three, and Six charging him with robbery affecting interstate commerce and aiding and abetting, in violation of 18 U.S.C. §1951(a) and §2; Count Four charging using, carrying, and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. §924(c)(1)(A)(ii) and §2; Count Five charging murder in the course of using and carrying a firearm, and aiding and abetting, in violation of 18 U.S.C. §924(j)(1) and §2.

In *Barrett v. United States*, 146 S. Ct. 482 (2026), the Supreme Court held that Congress did not clearly authorize convictions under both 18 U.S.C. § 924(c)(1)(A)(i) and § 924(j) for a single act that violates both provisions. Here, the Government agrees that Mr. Vincent's convictions for Count Four and Five are based on one act that violates both statutes and, accordingly, will move at sentencing to dismiss Count Four, which charges a violation of 18 U.S.C. § 924(c)(1)(AA)(ii).

Mr. Vincent was taken into local custody on August 22, 2022 for this offense conduct and was taken into federal custody on September 1, 2025. He has been in federal custody ever since.

**III. THE NEW TWO-STEP SENTENCING PROCESS UNDER THE 2025 GUIDELINES MANUAL**

On November 1, 2025, the United States Sentencing Commission implemented a major structural revision to the Guidelines Manual, expressly reorganizing it to reflect what the Supreme Court has required since *United States v. Booker*, 543 U.S. 220 (2005): that federal sentencing consists of two analytically distinct steps, and that the Guidelines are only the first step in a broader inquiry governed by 18 U.S.C. § 3553(a). The Commission's new Introductory Commentary makes clear that the 2025 Guidelines Manual is designed not as a prescriptive sentencing code but as a framework subject to the primacy of the statutory "parsimony principle" - a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing. See USSG Ch.1, Pt. A. intro. comment.

The Introduction states: "The Guidelines Manual is structured to reflect the advisory sentencing scheme established following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), recognizing both essential steps of the court's inquiry in imposing a sentence 'sufficient, but not greater than necessary.'… The guidelines and policy statements… represent the first step in the sentencing process and are one of multiple factors judges must consider under 18 U.S.C. § 3553(a)." USSG, Ch.1, Pt. A. intro. comment.

This structural revision is not merely cosmetic. It codifies nearly two decades of Supreme Court jurisprudence emphasizing that the Guidelines, while still the "starting point," no longer predominate in the selection of the appropriate sentence. The revised Manual thus reinforces that sentencing courts are obligated to perform two separate tasks:

**A. Step One: Properly Calculate the Advisory Guideline Range**

The first step is unchanged: the district court must begin by correctly calculating the advisory guideline range. *Booker* held that this calculation remains a mandatory component of sentencing procedure, even though the Guidelines themselves are not binding. *Booker*, 543 U.S. at 264. As the Background to §1B1.1 explains: "District courts are first required to properly calculate and consider the guidelines when sentencing.… 'The district courts, while not bound to apply the Guidelines, must… take them into account when sentencing.'" USSG §1B1.1,  comment. (backg'd), citing *Booker*, 543 U.S. at 264.

The Supreme Court has repeatedly reaffirmed this requirement:

- *Gall v. United States,* 552 U.S. 38, 49 (2007*)* (citing *Rita v. United States*, 551 U.S. 338, 347-348(2007): "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."
- *Gall v. United States*, 552 U.S. 38, 49 (2007): "[t]he Guidelines are the "starting point and initial benchmark."
- *Peugh v. United States*, 569 U.S. 530, 541–42 (2013): "the federal system adopts procedural measures intended to make the Guidelines the 'lodestone' of sentencing."

The 2025 Manual continues to require that the court calculate the Base Offense Level, apply any Chapter Two and Three adjustments, determine the criminal-history score, apply any statutory constraints, and determine the final advisory range. See USSG §1B1.1(a).

### B.  Step Two: Independently Apply § 3553(a) to Determine the Sentence That Is "Sufficient, but Not Greater Than Necessary"

Once the advisory range is calculated, the court must then proceed to the second, statutorily mandated step: the application of the § 3553(a) factors to determine the sentence that satisfies the parsimony principle. As §1B1.1's Background now states: "District courts are then required to fully and carefully consider the additional factors set forth in 18 U.S.C.

§ 3553(a)… Step two… reflects this step of the sentencing process." USSG §1B1.1 comment. (backg'd).

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

(a)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(b)     to afford adequate deterrence to criminal conduct;
(c)     to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, any pertinent policy statement, the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  See 18 U.S.C. §3553(a).

In exercising its sentencing discretion, the court is ultimately guided by the statutory factors, rather than being bound by the Guidelines. The Guidelines are "one factor among several." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

The 2025 revisions formalize this by restructuring the Manual to place the Guideline calculation in Step One and the §3553(a) analysis in Step Two, reinforcing what has long been true: the correct sentence is the one that is individualized, holistic, and not driven mechanically by the Guidelines grid.

**C.     The Elimination of Departures and the Reaffirmation of Individualized Sentencing**

One of the most significant 2025 changes is the removal of all "departure" provisions from Chapters Four and Five.[1] Historically, the Guidelines included dozens of "departure" mechanisms, that allowed a court to impose a sentence outside the guideline range before turning to §3553(a). But after *Booker*, courts largely abandoned departures in favor of "variances," which arise from the §3553(a) analysis itself.

The Commission explained: "[i]n 2025, the Commission amended the Guidelines Manual to remove departures… to better align the requirements placed on the court and acknowledge the growing shift away from the use of departures… The Commission envisioned and framed this 2025 amendment to be outcome neutral… [J]udges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts… as a variance under 18 U.S.C. §3553(a)." USSG, Ch.1, Pt. A. intro. comment.

"The removal of departures… does not limit the information courts may consider in imposing a sentence nor does it reflect a view… that such facts should no longer inform a court." The Commission is explicitly acknowledging that:

- *all* formerly departure-eligible circumstances remain fully cognizable under §3553(a);
- the sentencing court may consider any relevant, reliable information, including information about the defendant's health, family responsibilities, substance-abuse history, trauma, lack of criminal history, aberrant conduct, and other individualized factors – even if they were previously "discouraged" or "not ordinarily relevant";
- the decision whether and how to vary from the advisory range lies squarely within the district court's discretion, guided by §3553(a)'s statutory command, not by any "departure" rubric.

---

[1] The sole exception is the remaining portion of §5K1.1, which no longer employs the term "departure," but instead authorizes a "reduction" resulting in "a sentence below the otherwise applicable guideline range."  USSG §5K1.1

See 18 U.S.C. §3553(a) (setting forth the statutory framework requiring an individualized sentence that is "sufficient, but not greater than necessary"), 18 U.S.C. §3661 ("[n]o limitation shall be placed on the information" a court may consider at sentencing); *United States v. Booker*, 543 U.S. 220, 245–46 (2005) (holding Guidelines advisory and restoring full judicial discretion to consider all §3553(a) factors when selecting a sentence); *Gall v. United States*, 552 U.S. 38, 49–50, 57 (2007) (the Guidelines are the "starting point," but district courts must tailor sentences to the defendant; variances may rest on individualized factors and need not be tied to Guideline departures); *Rita v. United States*, 551 U.S. 338, 351 (2007) (sentencing courts must begin with the correct Guideline range but then conduct an independent, individualized assessment under §3553(a)); *Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007) (courts may vary based on policy disagreements with the Guidelines as well as individualized factors; the Guidelines do not bind the court's discretion); *Pepper v. United States*, 562 U.S. 476, 489–91 (2011) (sentencing judges may consider the "widest possible breadth of information" about the defendant, including personal history, rehabilitation, trauma, and other individualized factors; §3661 bars limitations on information considered at sentencing); *Nelson v. United States*, 555 U.S. 350, 351 (2009) (the Guideline range cannot be presumed reasonable; courts must make an independent determination under §3553(a)); *Peugh v. United States*, 569 U.S. 530, 541–42 (2013) (even in the advisory regime, the Guidelines remain only the "lodestone" and starting point; ultimate sentence must be justified by § 3553(a)); USSG, Ch.1, Pt. A. intro. comment. (eliminating departures; explaining that the amendment is "outcome neutral"; and expressly stating that facts formerly supporting departures remain fully available to

courts as variances under § 3553(a), and that removal of departures "does not limit the information courts may consider").

By placing all mitigation analysis under §3553(a), the 2025 Manual restores sentencing to what Congress intended in the Sentencing Reform Act: an individualized process in which judges weigh all relevant facts to reach a fair, just, and parsimonious sentence.

### D. The Guidelines Inform; § 3553(a) Decides

The result of these reforms is a sentencing structure that is more transparent, more coherent, and more aligned with controlling Supreme Court authority. The Guidelines calculation remains important, indeed, required, but its role is only one part of a broader, individualized analysis.

The Commission emphasizes that sentencing courts remain free to consider the full universe of mitigating information, noting that the 2025 amendments "do[es]not limit" what courts may consider. This reinforces that the Guideline range acts as a reference point; §3553(a) governs the ultimate sentence; and individualized justice, not grid-driven uniformity, is the touchstone of the post-Booker sentencing system.

In short, the 2025 Guidelines Manual reflects a sentencing system that is consistent with what the Supreme Court envisioned: a system in which the court uses the Guidelines as a starting point, but where the final sentence is driven by human facts, individual circumstances, and the statutory parsimony principle.

**IV. DETERMINING KEYONN VINCENT'S SENTENCE UNDER THE NEW TWO-STEP PROCESS**

    **A.    MR. VINCENT'S GUIDELINE CALCULATION**

The revised Presentence Investigation Report ("PSR") provides the offense level is calculated based upon four groups, one group for each robbery count. PSR ¶36-59. The adjusted offense level of the highest group (the robbery involving the murder count) is 43. PSR ¶37. There is no offense level increase for the number of units, and therefore the adjusted offense level is 43, after applying acceptance of responsibility points pursuant §3E1.1(a) and (b), the total offense level is 40. (PSR¶67).

Mr. Vincent has a total criminal history score of eight, placing him in Criminal History Category IV. PSR ¶75. Mr. Vincent accrues seven criminal history points for a retail theft occurring between the ages of 16 and 18 and one point for committing the instant offense while on probation in Delaware Count. (PSR¶68-80).

A total offense level of 40 combined with Criminal History Category IV yields an advisory guideline range of 360 months to life. (PSR¶157).

Mr. Vincent agrees with the guideline calculation as stated in the PSR. However, as the Supreme Court and the 2025 Guidelines Manual make clear, this calculation is only Step One. Step Two, application of § 3553(a), must determine the just and individualized sentence.

### B.   APPLICATION OF THE §3553(a) FACTORS TO KEYONN VINCENT

#### 1. Nature and Circumstances of the Offense

The offense conduct is undeniably grave, and Mr. Vincent acknowledges that reality. A firearm was discharged during a robbery, and a life was taken. However, the §3553(a) analysis requires individualized assessment of each participant's role, foreseeability, and intent.

Mr. Vincent was unarmed throughout the robbery. He did not carry, possess, or use a firearm at any time. Further, the evidence shows he was stunned, frozen, and unable to move when the firearm discharged. He remained immobilized until his co-defendant physically grabbed him by the neck and ordered him to continue gathering proceeds. This behavior is inconsistent with shared intent or anticipation of lethal violence.

Additionally, his criminal history contains no violence or firearm offenses.[2] His prior convictions consist exclusively of low-level theft offenses. He has never engaged in gun related conduct.

### 2. History and Characteristics of Keyonn Vincent

As more fully outlined in the Report of Jill Steinberg, Mr. Vincent's background includes prenatal drug and/or alcohol exposure, parental neglect, foster-care instability, adoption into an abusive home, homelessness, trauma, institutional placements, and severe mental illness. These factors deeply affected his development, judgment, and susceptibility to coercion. (PSR¶121-126; Jill Steinberg Report and CV, Exh. 1, p.1-6).

Despite the adversity he has endured, Mr. Vincent retains pro-social traits and is described by his sister as forgiving and trusting. (Exh 1, p. 5).

### a. Youthfulness and the Continued Relevance of Former §5H1.1 Under §3553(a)

Although the 2025 amendments to the Sentencing Guidelines eliminated mechanical departures, including those previously available under §5H1.1, the departures

---

[2] ¶112 of the PSR references an arrest for robbery and related charges and person not to possess a firearm and firearm carried without a license. Mr. Vincent does not recall being charged with robbery/theft. Rather, he recalls the incident as a domestic dispute during which his then girlfriend possessed a firearm. Mr. Vincent removed the firearm from her possession in an effort to prevent injury to anyone. His girlfriend called 911, and he was subsequently arrested. The charges were dismissed.

rational remains valid and lives on in Appendix B. The scientific, empirical, and criminological foundations that led the Commission to adopt that youthfulness policy statement remain directly relevant under 18 U.S.C. §3553(a). The Commission's 2024 amendment to §5H1.1 articulated a clear and evidence-based understanding of how youth affect culpability:

"Certain risk factors may affect a youthful individual's development into the mid-20s and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation." USSG §5H1.1 (2024).

The Commission emphasized that the amendment was "in line with its statutory duty to establish sentencing policies that reflect advancements in knowledge of human behavior as it relates to the criminal justice process," 28 U.S.C. §991(b)(1)(C), and that it was rooted in "evolving science and data surrounding youthful individuals," including the well-established age-crime curve and the fact that cognitive development—particularly in areas governing impulse control, risk assessment, and susceptibility to peer influence—continues into the mid-20s. The Commission further noted that certain risk factors, such as early trauma or unstable environments, heighten the developmental vulnerabilities of youthful individuals, while appropriate interventions can meaningfully promote desistance.

While the 2025 Guidelines Manual no longer authorizes departures and instead consolidates all mitigation into the §3553(a) analysis, the underlying policy rationale of

§5H1.1 remains fully intact. The Commission expressly stated that eliminating departures was "outcome neutral" and did not limit the court's ability to consider the very same facts—now as variances under §3553(a). Thus, the empirical insights and behavioral science that once supported a downward departure for youthful defendants continue to carry significant mitigating force.

Mr. Vincent was twenty-one years old at the time of the offense, squarely within the developmental window identified by the Commission, and, as detailed throughout this memorandum, he grew up in an exceptionally adverse environment defined by trauma, instability and deprivation from his earliest years. His background reflects precisely the developmental and environmental risk factors the Commission cited as contributing to youthful criminal behavior and diminished culpability. These same factors also strongly support his potential for rehabilitation.

Accordingly, while a mechanical departure under §5H1.1 is no longer available, the scientific, developmental, and empirical basis of that policy statement remains highly probative under §3553(a) and weighs heavily in favor of a sentence below the advisory guideline range in this case.

### b. Prenatal exposure, parental incapacity, and removal from home

Mr. Vincent was born to parents, Kenneth Bradsher and Tangineka Wilson, who were wholly incapable of providing a safe or stable home. He has two full siblings – Keyanna Vincent (23 years old) and Latanya Wilson (35 years old). He also has three half-sisters - Marques Wilson (35 years old), Kimani Wilson (approximately 30 years old),and Taj Wilson (27 years old). (PSR¶121-122).

His mother suffered from severe addiction, primarily involving crack cocaine and alcohol, and used throughout her pregnancy with Mr. Vincent. His father likewise struggled with addiction, was frequently incarcerated, and was abusive. (PSR¶121, Exhibit 1, p. 1). As a result, Mr. Vincent entered the world already burdened by significant prenatal risk factors and an environment marked by chaos, neglect, and violence.

Mr. Vincent was initially raised largely by his mother and maternal grandmother, both of whom were themselves addicted to crack cocaine. His mother was also a victim of sexual abuse, compounding the instability and trauma within the household. Mr. Vincent was routinely left unattended for extended periods of time by both his mother and grandmother. Neighbors and Department of Human Services (DHS) records indicate that the residence was possibly a drug house and that Mr. Vincent and his siblings were often dirty, lacked appropriate hygiene, and begged for food. (PSR¶1234, Exh. 1, p. 2-3).

By the age of four, the neglect had become so severe that Mr. Vincent's nine-year-old sister contacted DHS to report that the children, including a one-year-old infant, had been left alone overnight. At the time DHS intervened, Mr. Vincent was so underweight that his stomach was visibly distended, reflecting chronic malnutrition. All three children were removed and placed in foster care. (Exh. 1, p. 3).

Although Mr. Vincent's mother later completed a residential drug-treatment program and was reunified with her children, that stability proved short-lived. She relapsed within approximately six months, once again rendering the home unsafe. Mr. Vincent and one of his sisters were then placed with a relative caregiver who was already caring for another sibling. When that caregiver experienced financial hardship and could no longer

provide care, DHS again removed the children. Ultimately, Mr. Vincent and his sister were placed with the Vincents, who later adopted them. (Exh. 1, p. 3-4).

### c. Foster-care instability and adoption into severe abuse

Mr. Vincent spent early years in multiple foster placements before being adopted by the Vincents. (PSR¶123). Mr. Vincent's childhood with the Vincent's was marked by neglect, lack of clothing, severe beatings with belts, emotional degradation, abandonment during family vacations, and the sexual abuse and impregnation of his sister by the adoptive father. (PSR¶123-124, Exh 1, p. 4-5).

By age 11, he was running away from home, sleeping in abandoned cars, bathing at school, and stealing clothing to survive. (PSR¶120, Exh. p. 5).

Mr. Vincent's sister was impregnated by her adopted father, and he ultimately went to jail for rape. Once the abuse came to light, Mr. Vincent and his sister were removed from their adoptive parents' home and placed back in the system in 2018. Mr. Vincent was further traumatized by being separated from this closest sister and further from his other siblings. (PSR¶124, Exh. p. 5).

### d. Institutional placements and aging out without support

After being removed from the Vincent's home, Mr. Vincent was placed outside of Philadelphia County and further isolated from his sister, Keyonna and other siblings. He was placed with a woman in Springfield, Pennsylvania, who Mr. Vincent apparently liked but was asked to leave because he could not follow the rules. However, he was unable to accept the permanency of the situation and was not comfortable living in a home. (PSR¶124, Exh. 1 p. 6) He was enrolled in school but rarely attended. His IEP was out of date. Although Mr. Vincent was under court supervision in Philadelphia, DHS placed him

in Delaware County, and his school was in Philadelphia, which was far away, making it difficult to go to school. He was subsequently placed in several residential facilities, cycling through Vision Quest, Child First Services, The Bridge, and Carson Valley. He remained in DHS custody past age 18 but never received adequate treatment to address his mental health issues or the traumatic life he had already experienced. (PSR¶125, Exh. 1 p. 6).

### e. Mental Health Diagnoses

Mr. Vincent has a long and serious history of mental illness, with diagnoses that include ADHD, schizophrenia, neurodevelopmental disorder, cannabis use disorder, bipolar disorder, major depression, and documented suicidal behavior. (PSR¶131-137, Exh. 1, p. 13). These conditions emerged against a backdrop of severe developmental trauma and instability and have been persistent, complex, and difficult to treat.

Mr. Vincent has required multiple mental-health interventions, including inpatient psychiatric hospitalization. He was hospitalized at Friends Hospital following an emergency presentation that included an overnight stay at Thomas Jefferson Hospital, and he remained at Friends for approximately eleven days on that occasion. He later experienced a significantly longer inpatient psychiatric hospitalization at Friends Hospital lasting nearly six months. His was discharged from this last stay at Friends Hospital just over a month before the convenience store shooting. (PSR¶134, Exh. 1 p. 8). These hospitalizations underscore the severity of his psychiatric symptoms and the extent to which outpatient care alone was insufficient to address his needs.

In addition to these inpatient admissions, Mr. Vincent has a history of outpatient mental-health treatment and shorter hospitalizations that failed to provide sustained

stabilization. (PSR¶135). Those interventions were fragmented and inconsistent, and they obviously did not meaningfully address the interaction between his neurodevelopmental impairments, trauma history, and serious mental illness. As a result, Mr. Vincent cycled through periods of acute crisis without the benefit of a cohesive, long-term treatment plan.

This pattern appears to reflect not a lack of effort on Mr. Vincent's part, but a system that repeatedly intervened only at moments of crisis and then discharged him without adequate continuity of care. His psychiatric history is therefore best understood as the product of profound early trauma compounded by untreated or undertreated mental illness over many years.

### f. Mr. Vincent's Institutional Adjustment, Abuse, and Susceptibility to Future Abuse

At first glance, Mr. Vincent's institutional history could be misconstrued as evidence of chronic disruption or an unwillingness to comply with rules. A closer examination, however, reveals a different and more accurate picture: a young man whose serious, long-standing mental health needs have never been adequately addressed and who lacks the coping mechanisms necessary to function in highly restrictive institutional environments without proper clinical support.

It is true that Mr. Vincent has been transferred among multiple facilities and has spent significant periods housed in the Special Housing Unit while detained at the Federal Detention Center. Importantly, however, his behavioral incidents have been largely self-destructive rather than aggressive, and there is no indication that he has posed a danger to other inmates or staff. To the contrary, Mr. Vincent has himself been the victim of abuse, including sexual assault by another inmate, manipulation by an inmate who threatened him if he did not swallow a battery, which he did. Mr. Vincent has been placed on suicide

watch approximately 33 times and has undergone 46 suicide risk assessments while in BOP custody. (PSR ft. 11, Exh. 1, p. 7-8). Despite the difficulty of his incarceration, Mr. Vincent has obtained various self-help certificates while in BOP custody. (BOP certificates, Exh. 2).

This history of victimization, coupled with his mental illness and developmental impairments, places Mr. Vincent at heightened risk for future abuse if he is designated to a high-security penitentiary environment. Without appropriate intervention, he would be particularly vulnerable to exploitation and harm by older, more experienced, and more physically dominant inmates.

Jack Donson, who worked for the BOP for twenty-three years has reviewed Mr. Vincent's history and opined that, although Mr. Vincent may technically qualify for a high security designation under Bureau of Prisons criteria, such a placement would be counterproductive and dangerous. (Jack Donson Report and CV, Exh. 3). Mr. Donson recommends that the Court instead urge designation to a medium security facility - an environment that would remain safe for others while offering Mr. Vincent a realistic opportunity to adapt, stabilize, and access consistent medical and mental-health care. Placement in a less restrictive setting would significantly reduce the risk of further victimization and better align with Mr. Vincent's demonstrated needs and capacities. (Exh. 3, ¶18, 27, 28 and see also Section F *infra*.).

### g. Mr. Vincent's Future Outlook and Prospects

There is no dispute that Mr. Vincent must be held accountable for his conduct, which is serious, warrants punishment and hopefully provides some sense of justice to the victim's family. At the same time, an appropriate period of incarceration that prioritizes

stability, structure, and meaningful mental-health treatment is more than sufficient to serve the goals of sentencing in this case.

Mr. Vincent's history demonstrates that he will require substantial supervision and support upon release. His needs will extend beyond compliance with standard conditions of supervision and will include ongoing mental-health treatment, assistance with applying for disability benefits, support in obtaining and maintaining employment, and help navigating the basic demands of daily functioning. These are not short-term needs, but longstanding deficits stemming from a lifetime without consistent guidance, care, or stability.

With appropriate supervision and the involvement of individuals committed to his rehabilitation, support that Mr. Vincent has never meaningfully received, his strengths are likely to emerge. Those who know Mr. Vincent describe him as gentle, giving, and deeply motivated to please others.

His sister, Keyanna, with whom he is "as close as two people can be," describes longstanding cognitive and emotional struggles stemming from their upbringing, including difficulty with basic developmental tasks and a pattern of frustration in school where, rather than being supported, he was punished. She characterizes him as childlike, pure, and naïve, someone who is overly trusting, seeks approval (particularly from older male figures), and continues to search for the unconditional parental support he never received. She emphasizes that he harbors no resentment, cannot hold grudges, and is driven by a desire to care for others in ways he himself was never cared for. He is "a child in a grown man's body."  (Keyanna Vincent letter, Exh. 4).

This theme is echoed by his eldest sister, Latanya Bradsher Robinson, who describes him as emotionally open and deeply loving despite significant trauma, noting that unlike other family members, he never received consistent access to therapy or counseling. (Latanya Bradsher Robinson letter, Exh. 5).

Mr. Vincent's former DHS case manager, Alex Hiatt, who knew him from age 13, confirms a history of severe instability, including physical and emotional abuse by adoptive parents, abandonment, and the traumatic impact of abuse within the household. He notes that Mr. Vincent has never had a consistently responsible adult in his life, has largely been on his own since early adolescence, and received only sporadic mental health treatment. Importantly, he observed no history of violence or aggression; rather, he describes Mr. Vincent as someone simply trying to survive, often following those who offered guidance or a sense of direction. (Alex Hiatt letter, Exh. 6).

These letters make clear that Mr. Vincent is not defined by his conduct, but by his kind, gentle and trusting nature and capacity for positive growth. With structure, treatment, and support, the very qualities that have made him vulnerable (i.e. his trust, openness, and desire for connection) can instead serve as the foundation for genuine rehabilitation and a law-abiding future.

### C. The Need for the Sentence to Promote Respect for the Law, Provide Just Punishment, and Adequate Deterrence

A substantial sentence is necessary to reflect the seriousness of Mr. Vincent's conduct and to promote respect for the law. Nothing in this submission minimizes the gravity of the offense. At the same time, an excessive period of incarceration would exceed what is necessary to accomplish these goals.

Empirical research consistently demonstrates that increasingly lengthy sentences do not meaningfully enhance deterrence, particularly for individuals with significant trauma histories, serious mental illness, and neurodevelopmental impairments. For individuals like Mr. Vincent, whose conduct is shaped by impaired judgment, emotional dysregulation, and susceptibility to coercion, the marginal deterrent effect of a hefty sentence is minimal. What does promote respect for the law in such cases is a sentence that is firm, proportional, and oriented toward accountability and rehabilitation rather than permanent incapacitation.

A lengthy but finite term of imprisonment appropriately balances punishment with the realistic possibility of rehabilitation, reinforcing the legitimacy of the criminal justice system rather than undermining it through an outcome untethered to individualized culpability.

**D. The Need to Protect the Public**

The public can be adequately protected through a substantial term of imprisonment followed by a lengthy period of supervised release with robust treatment conditions. Mr. Vincent does not present a pattern of predatory or violent behavior toward others, and his principal risk factors - untreated mental illness, trauma, and neurodevelopmental deficits - are modifiable with appropriate intervention.

With trauma-informed therapy, psychiatric treatment, and structured supervision, Mr. Vincent's risk of reoffending can be meaningfully reduced. Continued incarceration beyond what is necessary to stabilize and treat him would not materially enhance public safety. By contrast, a sentence that incorporates treatment during custody and intensive

supervision upon release is more likely to reduce long-term risk and promote lawful conduct.

**E. Avoiding Unwarranted Sentencing Disparities**

Imposing an onerous sentence on Mr. Vincent - an unarmed, developmentally compromised, subordinate participant - could create unwarranted sentencing disparities when compared to similarly situated defendants nationwide. It would not create an unwarranted sentencing disparity to impose a sentence less than 360 to life given Mr. Vincent's limited role, lack of violent history, and significant cognitive and psychological impairments.

A sentence that recognizes Mr. Vincent's diminished culpability, relative role, and extraordinary mitigation avoids placing him in a category reserved for far more culpable actors and avoids a result that would be unjust given his overall background.

**F. The Need for Education, Vocational Training, and Medical Care**

Mr. Vincent requires significant and continuous mental-health treatment, substance-abuse treatment, and structured vocational programming while in Bureau of Prisons custody. As explained in Jack Donson's declaration, Mr. Vincent faces particular challenges in any custodial setting given his age, serious mental-health history, and lack of prior penitentiary experience.

The Bureau of Prisons (BOP) classifies inmates using a security-point system and public safety factors to determine placement. Based on his current assessment, Mr. Vincent is likely to accumulate sufficient points to be designated to a high-security penitentiary. As set forth in Mr. Donson's declaration, such a designation would be ill-suited to Mr. Vincent and unnecessarily dangerous. Given his mental-health conditions, youth, and absence of

any violent history, a medium-security facility would provide a far safer and more appropriate environment - one that maintains institutional security while allowing meaningful access to treatment and programming. (See Exh. 3).

Medium-security facilities are substantially more program-focused than penitentiaries. Penitentiaries are marked by higher levels of violence, entrenched gang activity, and frequent lockdowns that disrupt treatment and rehabilitative services. These conditions are particularly harmful for young adults with mental-health and developmental vulnerabilities, who are at heightened risk of victimization, coercion, and institutional misconduct. (Exh. 3, ¶15-16).

Placement at a medium-security facility would make Mr. Vincent eligible for programs directly tailored to his needs, including the BRAVE (Bureau Rehabilitation and Values Enhancement) program and the SKILLS program - neither of which is available at penitentiaries. BRAVE is a cognitive-behavioral, residential program for young men serving their first federal sentence and is designed to promote institutional adjustment, reduce misconduct, and foster pro-social decision-making. The SKILLS program is specifically designed for individuals with intellectual, neurological, and social impairments who are particularly vulnerable in custodial settings. (Exh. 3, ¶27, 28, 32, 33)

If Mr. Vincent were designated to a penitentiary, these programs would not be unavailable. In that circumstance, the Challenge Program, a cognitive-behavioral residential program addressing mental illness and substance use, would be the most appropriate alternative, though it is not as well suited to Mr. Vincent's profile as BRAVE or SKILLS. (Exh. 3, ¶29).

Mr. Vincent also has minimal employment history but demonstrates traits such as compliance, cooperativeness, and a strong desire to please others, that make him well suited for structured vocational training. Employment through Federal Prison Industries (UNICOR) would provide marketable job skills in a community-like work environment and significantly reduce the risk of recidivism. (Exh. 3, ¶31). Federal Prison Industries emulates a stringent community work environment, and inmates learn marketable employment skills from their work experiences. The BOP website indicates:

> "*Inmates who worked in FPI were significantly less likely to recidivate than inmates who did not participate. Inmates who participated were 24% less likely to revert to criminal behavior as much as 12 years following release and 14% more likely to be gainfully employed following release from prison.*"

Because inmates with court ordered financial obligations exceeding $1,000 receive priority placement on the UNICOR waiting list, Mr. Vincent respectfully requests the imposition of a $1,100 fine.

Accordingly, and as per Mr. Donson's declaration, Mr. Vincent respectfully requests that the Court recommend assignment of a "lesser security management variable," given his age, mental-health history, and lack of penitentiary experience. Such a recommendation would materially increase the likelihood that Mr. Vincent is placed in an environment that promotes safety, treatment, rehabilitation, and long-term public protection. (Exh. 3, ¶32, 33).

Mr. Vincent can become a productive member of society. A medium security facility is a far better place for mental health treatment, rehabilitation and work. A sentence that substantially varies below the guideline range is not only sufficient in terms of the number of years behind bars but also sufficient in terms of the security level and

environment under which Mr. Vincent will serve that sentence.  Following his release from custody, Mr. Vincent will be on supervised release. He will need assistance with housing and employment in additional to continued mental health and substance abuse treatment.

The Eastern District of Pennsylvania's STRIDES program—*Strategies That Result in Developing Emotional Stability*[3]—could be of great assistance to Mr. Vincent upon release. STRIDES is a post-conviction, problem-solving supervision program designed to address the needs of individuals with serious and persistent mental illness through intensive, judicially supervised treatment and support. The stated mission of STRIDES is to "maximize opportunities for long-term mental health stability with an emphasis of treating, coaching, and building pro-social supports for the participants so that they can best benefit from effective symptom management through treatment while successfully meeting the conditions of … post-conviction supervision." The program focuses not only on treatment compliance, but also on helping participants develop stability in housing, purpose, and community, with the overarching goals of preventing recidivism and promoting public safety. Participation in STRIDES following Mr. Vincent's release to supervised release would provide structured mental health treatment, frequent court oversight, and coordinated support from probation, treatment providers, and the Court, precisely the type of framework intended to assist individuals who are traumatized by their offense conduct and motivated to engage meaningfully in treatment. As designed, STRIDES would offer Mr. Vincent the supervision, accountability, and therapeutic support necessary to foster long-term emotional stability and successful reintegration into the community.

---

[3] https://www.paed.uscourts.gov/sites/paed/files/documents/STRIDES%20Program%20Description.pdf

## VI.  CONCLUSION

Keyonn Vincent stands before this Court prepared to accept the punishment his conduct warrants. He is deeply remorseful for his conduct. He asks that the Court consider the mitigating factors outlined herein.  Mr. Vincent respectfully submits that a total sentence that varies substantially below the guideline range is "sufficient but not greater than necessary." He requests that a $1,100 fine be imposed, that he be recommended to the STRIDES program upon being placed on supervised release and that his judgement of sentence specifically state as follows:

> *"The court strongly recommends the BRAVE or SKILLS programs and does not object to the assignment of a lesser security management variable at the BOP's discretion given the defendant's age, mental health history and lack of penitentiary experience. The court also recommends Federal Prison Industries (FPI UNICOR) and participation in a Department of labor vocational training apprenticeship program. If the BOP determines a high security facility is necessary, the Challenge Program at USP Allenwood is recommended due to the potential for visitation and to resolve the outstanding charges more easily in Pennsylvania."*

**Respectfully submitted**

*MARGARET M. GRASSO, ESQUIRE*
*Law Office of Margaret M. Grasso*
**Attorney for Keyonn Vincent**

March 31, 2026

1



# Zedek Partners, LLC
Mitigation and Sentencing Advocacy
Private Investigation

March 19, 2026

To:   Margaret M. Grasso, Esq.
325 Chestnut Street, Suite 800
Philadelphia, PA 19106

Re:   United States v. Keyonn Vincent
2023-CR-00215-5

## Keyonn Vincent Mitigation Report

### I.   EXECUTIVE SUMMARY



# Zedek Partners, LLC
### Mitigation and Sentencing Advocacy
### Private Investigation



## II.    PROCESS





## II.    KEYONN'S STORY



before abandoning the family.




held Keyanna back while











the

Vincent011







# Zedek Partners, LLC
## Mitigation and Sentencing Advocacy
## Private Investigation

and Human Services. *Letter to all the directors of State and Tribal child welfare agencies* at HHS Letter









# Zedek Partners, LLC
Mitigation and Sentencing Advocacy
Private Investigation

---

Submitted by Jill Steinberg, Mitigation Specialist*

March 19, 2026

\* Jill Steinberg is a licensed private investigator and mitigation specialist in private practice, with 16 years of experience.  She is a former mitigation specialist and investigator with the Philadelphia Federal Defender office, trained in mitigation, sentence advocacy, victim outreach, reentry planning and alternative sentencing. She has a BA from the University of Georgia, an MA from New York University, and is ABD at this same institution.

Jill Steinberg

██████████
██████  [Jill@ZedekPartners.com](mailto:Jill@ZedekPartners.com)

CAREER CHRONOLOGY

**Managing Director,** *Zedek Partners, LLC* — New York, New York          1/2017 – Present

- Resourceful Bi-Lingual Investigator and Mitigation Specialist: Licensed by the State of New York. Skilled researcher and resource locator, fluent in Spanish. Experienced in conducting due diligence as well as criminal defense and mitigation investigations. Adept at interviewing and eliciting sensitive information, compiling comprehensive psycho-social histories based on an exhaustive investigation, analyzing the significance of information to sentencing concerns, developing mitigating themes in the client's history, and identifying and preparing appropriate expert witnesses. Certified in Defense-Initiated Victim Outreach and Money Laundering Investigations. Cases include, but not limited to: capital crimes, drugs, homicide, gangs, sex offenders, financial crimes, weapons charges, *Miller* resentencings, IRAA and SLAA hearings.

- Holistic Problem Solver: Extensive experience creating successful re-entry and alternative sentencing plans by cross-managing relationships between and among stakeholders including the defendant, his/her family, defense counsel, social service providers, expert witnesses, the court system, and law enforcement.

**Director,** *K2 Intelligence* — New York, New York          3/2015 – 1/2017

- Designed, implemented and managed investigations, in English and Spanish, in the United States and abroad, specializing in Latin America. Representative investigations include proxy fights; counterfeit consumer products; pre-investment due diligence; data breach litigation; and political opposition research.
- Performed manual and open source research; Conducted source inquiries; Analyzed results and prepared reports.
- Team Lead on regulatory lookback involving prepaid debit card accounts; Trained new AML personnel to detect suspicious bank transactions and conduct investigative due diligence. Supervised analysts assisting them in the identification of unusual transaction patterns.

**Investigation and Mitigation Specialist,** *Federal Defender Community Office for the Eastern District of Pennsylvania* — Philadelphia, Pennsylvania          7/2009 – 2/2015

- Planned and conducted pre-trial criminal investigations for individuals accused of federal offenses.
- Procured evidence and extensive documentation relating to clients' background through investigation, interviews, subpoenas, and open source research. Prepared mitigation reports.
- Identified and coordinated alternatives to incarceration and submitted sentencing recommendations to the Federal District Court and the Mental Health Court.
- Developed relationships and counseled clients and family members in Spanish and English regarding procedures, sentences, and local resources.
- Researched and developed networks of community organizations and public agencies to coordinate alternative sentencing and re-entry plans.
- Developed relationships with a variety of stakeholders, including prosecutors, defense counsel, court and prison personnel, community members, and service providers to attain appropriate sentencing outcomes.
- Collected and maintained resources relating to federal sentencing and trends in criminal justice.
- Collaborated with the Federal Re-entry and Mental Health Courts. Represented Federal Defender Office on the Philadelphia Re-entry Coalition.

Vincent019

Jill Steinberg



Jill@ZedekPartners.com

**Associate Director,** *Control Risks* — New York, New York                4/2006-3/2009
- Designed, implemented and managed investigations in the United States and abroad, specializing in Latin America.
- Conducted independent AML compliance reviews of banks and MSBs in Mexico and Venezuela.
- Developed and implemented training program for new analysts. Reviewed and edited reports by junior staff members prior to delivery to clients.

**Associate Managing Director**, *Ivision International*— New York, New York                9/2005-4/2006
- Designed, implemented and managed investigations in the United States and abroad, specializing in Latin America.
- Performed manual and open source research; Analyzed results and prepared reports.
- Supervised team of investigators and managed budgets and contracts.

**Researcher and Analyst,** *Consultant* — Madrid, Spain and New York, New York                2003-2005
Developed and executed research projects. Conducted open source research and analysis, source inquiries, performed Spanish to English translations, and monitored media. Major projects included:
- Report on the political situation in Spain to prepare visiting foreign delegations for interviews with high ranking government officials.
- Report on Spain's compliance with directives issued by the Organization for Security and Co-operation in Europe (OSCE) and European Commission against Racism and Intolerance (ECRI)
- Report on activities of extremist groups in Spain

## EDUCATION

**Masters Degree** — New York University (1997)
School of Education, Department of Culture and Communication. Completed all coursework towards doctoral degree with a teaching fellowship. Awarded Master Teaching Fellow. Research Assistant to Dr. Neil Postman. Masters Degree obtained in 1997.

**Study Abroad**
**Russia**—Social History of Russia (Politics and the Arts) and Teaching Literature and Arts from a Political Perspective; **Czech Republic**—Culture and Communication in the Czech Republic; **Holland**—Communication, Community and Democracy

**Bachelor of Arts** —University of Georgia (1990)
Evelyn P. Cone Scholarship for outstanding academic achievement. Inducted into Phi Beta Kappa and Phi Kappa Phi Honor Society

## CERTIFICATIONS/MEMBERSHIPS

**Certifications**: Anti-Money Laundering Specialist (CAMS), Defense Initiated Victim Outreach (DIVO), Pennsylvania Client Placement Criteria (treatment assessment).
**Memberships**: Philadelphia Re-entry Coalition, National Defender Investigator Association, National Legal Aid and Defender Association, Associations of Certified Anti-Money Laundering Specialists (ACAMS), Association of Certified Fraud Examiners (ACFE), National Alliance of Sentencing Advocates and Mitigation Specialists (NASAMS).

Vincent020

2

Vincent021

Vincent022



**U.S. Department of Justice**
**Federal Bureau of Prisons**

# Certificate of Completion

is presented to

## Keyonn Vincent

75888-510

For successful completion of
*Feelings*

January 3rd, 2025

Federal Detention Center
Philadelphia, PA

_____
Dr. Jagoda

Vincent023



**U.S. Department of Justice**
**Federal Bureau of Prisons**

# *Certificate of Completion*

is presented to

# **Keyonn Vincent**

75888-510

For successful completion of
*Improving My Mental Health*

January 7th, 2025

Federal Detention Center
Philadelphia, PA

Dr. Jagoda



**U.S. Department of Justice**

**Federal Bureau of Prisons**

# Certificate of Completion

is presented to

# Keyonn Vincent

75888-510

## For successful completion of
### *Denial*

## January 3rd, 2025

Federal Detention Center
Philadelphia, PA

*Dr. Jagoda*

Vincent024



Vincent025

**U.S. Department of Justice**
**Federal Bureau of Prisons**

# Certificate of Completion

is presented to:

## Keyonn Vincent

75888-510

For successful completion of
Traumatic Stress and Resilience Group

December 19, 2023

Federal Detention Center
Philadelphia, PA

_____
Dr. Huseman

Vincent026



**U.S. Department of Justice**

**Federal Bureau of Prisons**

# Certificate of Completion

is presented to:

## Keyonn Vincent

75888-510

For successful completion of

Anger Management Self-Study Psychology Workbook

March 12, 2024

Federal Detention Center
Philadelphia, PA



Dr. Huseman

Vincent027

# Certificate of Completion

this certifies that

*Keyonn Vincent*

has satisfactorily completed

**Turning Point Self-Help Series:
Preparing to Change**

*September 5, 2024*

*FDC Philadelphia*

*Dr. Jagoda, Chief Psychologist*

# Certificate of Completion

this certifies that

*Keyonn Vincent*

has satisfactorily completed

**Turning Point Self-Help Series:
Coping Skills**

September 5, 2024

*FDC Philadelphia*

_Dr. Jagoda, Chief Psychologist_



## U.S. Department of Justice
### Federal Bureau of Prisons

# Certificate of Completion

is presented to

# *Keyonn Vincent*

75888-510

For successful completion of
Thinking Errors Psychology Self-Study Workbook

September 12, 2024

Federal Detention Center
Philadelphia, PA

_____
Dr. Huseman

Vincent029

Vincent030



**U.S. Department of Justice**
**Federal Bureau of Prisons**

# Certificate of Completion

is presented to:

# *Keyonn Vincent*

75888-510

For successful completion of
Practicing Gratitude Self-Study Psychology Workbook

November 22, 2023

Federal Detention Center
Philadelphia, PA



Dr. Huseman

3

Vincent031

| | | |
|---|---|---|
| UNITED STATES | : | Case No.: 2:23cr00215-005 |
| | : | |
| v. | : | |
| | : | |
| KEYONN VINCENT | : | Judge: Hon. Kelly Brisbon Hodge |

## AFFIDAVIT OF JACK DONSON

1. I, Jack Donson, hereby declare under penalty of perjury that the following is true and correct. I submit this Declaration at the request of counsel to provide information relevant to his sentencing.

## STATEMENT OF EXPERTISE

2. I am the Founder of My Federal Prison Consultant, which I started after retiring from a career with the Federal Bureau of Prisons (BOP). I provide consulting, training and expert witness testimony on federal prison issues. I have worked directly with federal offenders for over 37 years and have testified in district courts throughout the country. I am also the executive director of a non-profit organization called the Federal Prison Education and Reform Alliance-PERA. We provide training, education and support to the federal justice community, so they have a better understanding of BOP policy and process for representation and advocacy.

3. I was employed by the BOP for twenty-three years working with staff and inmates in security classification, correctional programs and treatment. I actively follow policy initiatives and routinely attend training conferences, including the U.S. Sentencing Commission conference, which includes a presentation by BOP staff on current prison issues. I am a member of both the American Bar Association (ABA) and National Association of Criminal Defense Lawyers' (NACDL) corrections committees. I have authored articles and book chapters on federal prison matters in national print media, legal periodicals and ABA publications.

4. During my career, I worked directly with inmates and trained staff as a Correctional Treatment Specialist (case manager & case management coordinator). I completed hundreds of training courses including basic and advanced case management training and leadership related courses. I had full-time collateral administrative responsibilities including an instructor in annual and specialized training for case management staff, mentoring, local policy writing, conducting facility audits, and overseeing institutional programs. I have worked in minimum (camp), low, medium, administrative (pre-trial and high security), and Witness Security (PCU) units. On several occasions, I was assigned to the BOP Philadelphia Regional Office (NERO) and the New York City Community Corrections Office (TDY). I have expertise with U.S. Parole Commission policy and BOP sentence computations. Prior to working for the federal government, I was

employed in the Commonwealth of Pennsylvania as a Probation & Parole Officer where I wrote pre-sentence investigations, supervised the work release program and managed a caseload of adult and juvenile offenders.

5. My skillset is unique, policy-focused, and has been molded by my regular interaction with BOP staff and administrators as well as inmates in the trenches of the federal prison system. This interaction has continued during my retirement through daily contacts with attorneys, non-governmental organizations, and email correspondence with incarcerated people from around the prison system. In my role with FedCURE as their National Director for Inmate Programs and Services, I regularly interacted with BOP central office staff regarding prison issues and was solicited for feedback on legislation such as the First Step Act. I have conducted First Step Act related training for the NACDL, AOUSC and federal defender organizations. I have been invited to attend meetings with the GAO regarding the First Step Act and the DOJ for the Access to Justice and federal prison oversight initiatives.

6. I have been qualified as an expert witness several dozen times in accordance with Federal Rule 702 (Daubert Standards). I have never been denied the ability to testify as an expert witness on BOP related issues.

7. I hold a bachelor's degree in Sociology/Anthropology and a Master of Science Degree in Criminal Justice. Aside from consulting, I was a Lecturer at Marywood University for several years and taught Criminal Justice courses, including one entitled The American Prison. A true and correct copy of my *Curriculum Vitae* is attached.

8. I have personal knowledge of the facts stated herein and can testify competently thereto if called as a witness in this matter.

## SCOPE OF REVIEW

9. I have received from Mr. Vincent's counsel the PSR and mitigation report which included various juvenile justice system clinical reports submitted to the family court. I have been asked to estimate his security classification and provide the court with a professional opinion regarding a facility designation to best accommodate his program needs for rehabilitation, safety and treatment given his youth and history of mental illness. I offer my opinion from a BOP correctional treatment perspective based on nearly four decades of experience.

## SUMMARY OF FINDINGS

10. Mr. Vincent will be vulnerable in any high security facility and will be subject to predation given his age, lack of prior federal prison experiences and mental health deficits. To better manage this liability, it is recommended that the court make a specific and strongly worded recommendation at sentencing for his facility designation and program participation to best meet his rehabilitation, treatment and safety needs.

Vincent033

## SECURITY CLASSIFICATION (BRAVO) AND "MANAGEMENT VARIABLES"

11. The BOP classifies facilities into several categories including minimum security (camp), low and medium security (FCI's), high security (USP) and administrative (MCC/MDC/FDC & Medical Centers). The inmate classification tool is known as "BRAVO" (Bureau Risk Assessment Verification and Observation).

12. Some of the factors used in BOP classification include age, criminal history points, history of violence and/or escape and characteristics of the instant offense. Each factor has a corresponding point value, which are totaled to determine an overall security level and facility placement. Below is a chart based on the BOP classification manual (CPD/CPB, Number P5100.08, Inmate Security Designation and Custody Classification).[1]

| Security Level | Male | Female |
|---|---|---|
| MINIMUM | 0-11 Points | 0-15 Points |
| LOW | 12-15 Points | 16-30 Points |
| MEDIUM | 16-23 Points | N/A |
| **HIGH** | **24 + Points** | 31 + Points |

13. Security points alone do not determine the level as BOP policy includes other "*public safety factors*" (PSFs) that can elevate a security despite the security score. Mr. Vincent will have at least one PSF due to the instant offense being of the greatest severity and it is likely he will have an additional PSF based on the length of the sentence.

14. Notably, the classification policy also has what are referred to as "*management variables*" that allows the BOP the discretion to designate offenders to a facility below their scored security level for various penological purposes. For instance, I have estimated that Mr. Vincent will be assigned high security (32 points) meaning placement in a USP. (See exhibit 1) The BOP however has the discretion to assign a "*lesser security*" management variable given his age and vulnerability in a U.S. penitentiary environment. For the reasons discussed below, I strongly urge the Court to recommend such a "management variable" for Mr. Vincent. While it will not reduce his sentence, it will increase his safety, treatment and rehabilitation.

### U.S. PENITENTIARY ENVIRONMENT and YOUTHFUL OFFENDERS

15. U.S. Penitentiaries are violent, predatory environments that are gang-centric and difficult to navigate, especially for young adults. The current classification system assigns eight security points for offenders 24 years old and younger which is one-third of the security points needed for high security. The BOP also scores open charges as detainers. In my

---

[1] https://www.bop.gov/policy/progstat/5100_008cn.pdf

3

Vincent034

professional opinion, the classification formula overrepresents Mr. Vincent's security needs.

16. An unfortunate reality in the federal prison system is that when new inmates arrive, they are almost immediately approached by other inmates to "*show their papers*" in a sub-cultural vetting process. This process is done to identify cooperators (aka: "*rats*") and sex offenders (aka: "*chomos*"). When inmates are unable to produce court documents, other inmates will go as far as conducting Google and PACER searches to determine the crime and look for irregularities in docket entries, case information, etc. This process is more regimented and intense in penitentiaries where gang members are assigned the specific task of checking other inmates' cases and recruiting new arrivals. Inmates with tattoos are also stripped down by the other inmates to identify prior gang affiliations. These subcultural vetting activities are intimidating for inmates without significant prison experiences. Mr. Vincent's age and small stature will make him vulnerable in the penitentiary setting and it is likely he will seek protection with the potential for gang affiliation.

### MENTAL HEALTH CLASSIFICATION and TREATMENT

17. From a medical/clinical classification perspective, all inmates are assigned a provisional medical classification for both physical and mental health during the designation process. It is a four-level system referred to as "*Care Levels*"[2] which are explained in Program Statement # 5310.016, Treatment and Care of Inmates with Mental Illness and a BOP care level clinical guide as indicated below[3]:

(1) CARE1-MH: No Significant Mental Health Care. An individual is considered to meet CARE1-MH criteria if he/she:

- Shows no significant level of functional impairment associated with a mental illness and demonstrates no need for regular mental health interventions; and
- Has no history of serious functional impairment due to mental illness or if a history of mental illness is present, the inmate has consistently demonstrated appropriate help-seeking behavior in response to any reemergence of symptoms.

(2) CARE2-MH: Routine Outpatient Mental Health Care or Crisis-Oriented Mental Health Care. An individual is considered to meet CARE2-MH criteria if he/she has a mental illness requiring:

- Routine outpatient mental health care on an ongoing basis; and/or
- Brief, crisis-oriented mental health care of significant intensity; e.g., placement on suicide watch or behavioral observation status.

(3) CARE3-MH: Enhanced Outpatient Mental Health Care or Residential Mental Health Care. An individual is considered to meet the criteria for CARE3-MH if he/she has a mental illness requiring:

---

[2] https://www.bop.gov/policy/progstat/5310_016_cn-1.pdf
[3] https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf

4

Vincent035

- Enhanced outpatient mental health care (i.e., weekly mental health interventions); or
- Residential mental health care (i.e., placement in a residential Psychology Treatment Program).

(4) CARE4-MH: Inpatient Psychiatric Care. A mentally ill inmate may meet the criteria for CARE4-MH and require acute care in a psychiatric hospital if the inmate is gravely disabled and cannot function in general population in a CARE3-MH environment.

18. It is highly unlikely that Mr. Vincent will merit designation to a federal medical center, and he will likely be housed in the general population in a mainstream federal facility. This is concerning because regular facilities are not staffed with clinical resources for regular individual psychotherapy unless a person's mental health care level is elevated due to a crisis or severe mental illness. The above refenced clinical guide gives the example of care level three inmates as, *"severe mental illness in remission on medication."* From the documentation reviewed, it is likely Mr. Vincent is assigned as care level 1 for his physical health and care level 2 for his mental health classification. His clinical contacts will be limited to a monthly contact, for crisis intervention, or in a group program setting. The BOP does not have the clinical resources to conduct weekly individual counseling unless the care level is elevated. He will simply not be able to obtain any type of regular individual clinical counseling which will be most problematic in a general population penitentiary setting.

## CORRECTIONAL TREATMENT PROGRAMS

19. It is well known within the federal justice community that the BOP is experiencing staff shortages and frequently locks downs it's higher-level facilities. This inhibits the delivery of programs and services and happens more in the penitentiaries where security is paramount to treatment. In addition, staff such as teachers and counselors are also required to occupy correctional officer positions due to the shortages in what is referred to as augmentation. There are also extensive waiting lists. I have recently worked on cases where inmates were on waiting lists going back to 2023.

20. Even medical facilities with greater compliments of clinical staff have come under scrutiny. A DOJ report released by the Inspector general in December of 2024 on FMC Devens indicated:

*"FIRST STEP Act (FSA) programs offered by the Psychology Services Department had the longest waitlist across the institution, which employees attributed to staffing challenges in the Psychology Services Department. Additionally, programming for inmates with higher mental health care levels was prioritized, leaving inmates with lower mental health care levels with a lack of programming and resources Significant and widespread staffing shortages in the Health Services Department compromise FMC Devens's ability to provide adequate healthcare to inmates.[4]*

---

[4]https://oig.justice.gov/news/doj-oig-releases-inspection-bops-federal-medical-center-devens

Vincent036

21. These reports are disturbing considering that recent legislation aimed at federal prison oversight has not been fully implemented and the Ombudsman aspect of law has not been funded. The oversight law itself was initiated after investigative journalism by organizations such as the Associate Press and NPR on the inadequacy of BOP medical care.[5]

22. A concern from the data reviewed is relative to the numerous suicide risk assessments conducted since Mr. Vincent has been detained. A recent DOJ-IG report on inmate deaths that indicated:

*"Suicide Represents a Significant Risk Area for the BOP, Which the BOP Can Help Mitigate through Compliance with Existing Policies. We found that a combination of recurring policy violations and operational failures contributed to inmate suicides, which accounted for just over half of the 344 inmate deaths we reviewed. Specifically, we identified deficiencies in staff completion of inmate assessments, which prevented some institutions from adequately addressing inmate suicide risks. We also found potentially inappropriate Mental Health Care Level assignments for some inmates who later died by suicide."* [6]

23. The August 2025 First Step Act Approved Programs Guide contains programs that are seemingly available to address Mr. Vincent' correctional treatment needs. The more intensive BOP programs are delivered in residential unit settings referred to as therapeutic communities. These programs are not offered in all facilities and the BOP classification manual allows the agency to have discretion to designate inmates to programs at facilities that are not commensurate with their security level. The mechanism in which this can be done is referred to as a *"management variable."*

24. The best way to overcome BOP deficits in programming is for Mr. Vincent to be placed in one of the few residential therapeutic community programs. These programs have a higher ratio of clinical staff with offices within the program unit which provides for a safer housing environment. Based on the information contained in the documents reviewed, Mr. Vincent would be appropriate for the following programs:

**BRAVE:** This program is delivered in a medium security facility and described in BOP literature as:

*"The Bureau Rehabilitation and Values Enhancement (BRAVE) program is a cognitive behavioral, residential treatment program for younger, initial designated adults in custody (AIC). Offenders typically participate in this program at the beginning of their sentence. Programming is delivered within a modified therapeutic community (MTC). Participants interact in groups and attend community meetings while living in a housing unit separate*

---

[5] NPR, Lawmakers push for federal prison oversight after reports of inadequate medical care, (Dec. 12, 2023), https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inade-quate-medical-
[6] https://oig.justice.gov/news/doj-oig-releases-report-issues-surrounding-inmate-deaths-federal-bureau-prisons-insti-tutions

Vincent037

*from the general population. The BRAVE program is designed to facilitate favorable institutional adjustment and reduce incidents of misconduct. Program content focuses on developing interpersonal skills, behaving pro-socially in a prison environment, challenging antisocial attitudes and criminality, drug education, developing problem solving skills, success strategies and planning for release. The AIC must meet the following: AIC is 40 years of age or younger; AIC has a sentence of at least 36 months remaining to serve; AIC is a first time Bureau commitment; and AIC is within the first 18-months of his sentence."* (See exhibit 2)

25. To facilitate this program for Mr. Vincent a strong judicial recommendation for the assignment of a management variable for program participation given Mr. Vincent's age and vulnerability.

## SKILLS:

*"The Skills Program is a unit-based, residential treatment program designed to improve the institutional adjustment of those who have intellectual and social impairments. Individuals with lower IQs, neurological deficits from acquired brain damage, fetal alcohol syndrome, autism spectrum disorder, and/or remarkable social skills deficits are more likely to be victimized and/or manipulated by those more sophisticated. As a result, they may be placed in the Special Housing Unit for their protection or may have frequent misconduct reports because of their limited decision-making skills. Only those who have a demonstrated need for the Skills Program and who are appropriate for housing in a medium or low security facility will be considered for participation. Through using a modified therapeutic community (MTC), the Skills Program employs a multi-disciplinary treatment approach aimed at teaching participants basic educational and social skills. The goal of the program is to increase the academic achievement and adaptive behavior of this group of individuals, thereby improving their institutional adjustment and likelihood for successful community reentry. Some participants may become Mental Health Companions; these individuals are carefully screened and serve as supports and role models for Skills Program participants."* (See exhibit 3)

26. The designation to this program would also require a judicial recommendation for the same program management variable.

**CHALLENGE**: This program is delivered in a high security (USP) and described in BOP literature as:

*"The Challenge Program is a cognitive behavioral, residential treatment program developed for male offenders in the United States Penitentiary (USP) settings. The Challenge Program provides treatment to high-security offenders with substance use problems and/or mental illnesses. Programming is delivered within a modified therapeutic community (MTC); individuals participate in interactive groups and attend community meetings while living in a housing unit separate from the general population. In addition to treating substance use disorders and mental illnesses, the program addresses*

Vincent038

*criminality, via cognitive behavioral challenges to criminal thinking errors."* (See exhibit 4)

**Drug Treatment**:

27. Drug programming in this case will be automatic and there is no need for a judicial recommendation in this area. The basic Drug Education Program and Non-Residential Drug Treatment programs are offered at all facilities. The Residential (RDAP) program is offered at select facilities. It should be noted that if Mr. Vincent completed the Residential Drug Abuse Treatment Program, he is <u>not</u> eligible for early release under 18 USC 3621(e) due to his conviction for a crime of violence. He is also <u>not</u> eligible for the extra time credits under the First Step Act.

## CONCLUSION

28. Mr. Vincent faces significant challenges in any carceral setting given his age, mental health and lack of prior prison experience. Most concerning is the potential for the designation to a U.S. penitentiary. While this report is critical of the BOP's delivery of psychology services and staffing, it is corroborated with official government reports. Therefore, it would be practical for the court to provide a more targeted judicial recommendation for his designation to the safest environment based on his rehabilitation needs. The BOP attempts to accommodate judicial recommendations and has historically tracked compliance at over 70%.

29. Suggested language for the court would be: *"The court strongly recommends the BRAVE or SKILLS programs and does not object to the assignment of a <u>lesser security</u> management variable at the BOP's discretion given the defendant's age, mental health history and lack of penitentiary experience. The court also recommends Federal Prison Industries (FPI UNICOR) and participation in a Department of Labor vocational training apprenticeship program. If the BOP determines a high security facility is necessary, the Challenge Program at USP Allenwood is recommended due to the potential for family visitation and to resolve the outstanding charges in Pennsylvania more easily."*

Executed on this 16th day of February 2026

Jack T. Donson, President and Founder _____

8

Vincent039

# INMATE LOAD AND SECURITY DESIGNATION CDFRM

**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

## INMATE LOAD DATA

**1. REGISTER NUMBER:**

| 2. LAST NAME | 3. FIRST NAME | 4. MIDDLE | 5. SUFFIX |
|---|---|---|---|
| Vincent | Keyonn | | |

| 6. RACE | 7. SEX | 8. ETHNIC ORIGIN | 9. DATE OF BIRTH |
|---|---|---|---|
| B/AA | M | NH | 03/22/2001 |

**10. OFFENSE/SENTENCE**
18 USC 1951 (a) & 2, 924 C, 924 (j)

| 11. FBI NUMBER | 12. SSN NUMBER |
|---|---|
| A89W4DD50 | |

| 13. STATE OF BIRTH | 14. OR COUNTRY OF BIRTH | 15. CITIZENSHIP |
|---|---|---|
| PA | | US |

**16. ADDRESS-STREET**

| 17. CITY | 18. STATE | 19. ZIP | 20. OR FOREIGN COUNTRY |
|---|---|---|---|
| Philadelphia | PA | | |

| 21. HEIGHT | 22. WEIGHT | 23. HAIR COLOR | 24. EYE COLOR |
|---|---|---|---|
| FT 5' 4"    IN | 150    LBS | | |

**25. ARS ASSIGNMENT:**

## SECURITY DESIGNATION DATA

| 1. JUDGE | 2. REC FACILITY | 3. REC PROGRAM | 4. USM OFFICE |
|---|---|---|---|
| Hon. Bruce Howe Hendricks | | | D/SC |

**5. VOLUNTARY SURRENDER STATUS**          **0 = NO**          **(-3) = YES**

IF YES, MUST INDICATE:    5a. VOLUNTARY SURRENDER DATE:

5b. VOLUNTARY SURRENDER LOCATION:          `0`

**6. MONTHS TO RELEASE :**

| 7. SEVERITY OF CURRENT OFFENSE | 0 = LOWEST / 1 = LOW MODERATE | 3 = MODERATE / 5 = HIGH | 7 = GREATEST | 7 |
|---|---|---|---|---|

| 8. CRIMINAL HISTORY SCORE | 0 = 0-1 / 2 = 2-3 | 4 = 4-6 / 6 = 7-9 | 8 = 10-12 / 10= 13 + | 6 |
|---|---|---|---|---|

8a. SOURCE OF DOCUMENTED      - PRESENTENCE INVESTIGATION REPORT or          - NCIC III

| 9. HISTORY OF VIOLENCE | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 3 | 5 | 7 |
| | SERIOUS | 0 | 2 | 4 | 6 | 7 | |

| 10. HISTORY OF ESCAPE OR ATTEMPTS | | NONE | >15 YEARS | >10 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 2 | 3 | 02 |
| | SERIOUS | 0 | 3(S) | 3(S) | 3(S) | 3(S) | |

| 11. TYPE OF DETAINER | 0 = NONE / 1 = LOWEST/LOW MODERATE | 3 = MODERATE / 5 = HIGH | 7 = GREATEST | 3 |
|---|---|---|---|---|

| 12. AGE | 0 = 55 and over / 2 = 36 through 54 | 4 = 25 through 35 / 8 = 24 or less | | 4 |
|---|---|---|---|---|

| 13. EDUCATION LEVEL | 0 = Verified High School Degree or GED<br>1 = Enrolled in and making satisfactory progress in GED Program<br>2 = No verified High School Degree/GED and not participating in GED Program | 2 |
|---|---|---|

13.a HIGHEST GRADE COMPLETED

| 14. DRUG/ALCOHOL ABUSE | 0 = NEVER/>5 Years | 1 = <5 Years | 1 |
|---|---|---|---|

| 15. SECURITY POINT TOTAL | | | 32 |
|---|---|---|---|

| 16. PUBLIC SAFETY FACTORS | A-NONE<br>B-DISRUPTIVE GROUP (males only)<br>C-GREATEST SEVERITY OFFENSE (males only)<br>F-SEX OFFENDER<br>G-THREAT TO GOVERNMENT OFFICIALS<br>H-DEPORTABLE ALIEN | I-SENTENCE LENGTH (males only)<br>K-VIOLENT BEHAVIOR (females only)<br>L-SERIOUS ESCAPE<br>M-PRISON DISTURBANCE<br>N-JUVENILE VIOLENCE<br>O-SERIOUS TELEPHONE ABUSE | C |
|---|---|---|---|

**17. REMARKS**

Note: 8 points for age if des. processed by March 22! the Arson (set fire) report might be scored as serious violence, I don't like the "Disposition not reported for the 4/2/20 Robbery! MH CL-3 (limits des. options) High security USP-

**18. OMDT REFERRAL (YES/NO)**          n

vincent040

# BRAVE (RESIDENTIAL)

## DESCRIPTION

The Bureau Rehabilitation and Values Enhancement (BRAVE) program is a cognitive behavioral, residential treatment program for younger, initial designated adults in custody (AIC). Offenders typically participate in this program at the beginning of their sentence. Programming is delivered within a modified therapeutic community (MTC). Participants interact in groups and attend community meetings while living in a housing unit separate from the general population. The BRAVE program is designed to facilitate favorable institutional adjustment and reduce incidents of misconduct. In addition, the program encourages participants to positively interact with team members and take advantage of opportunities to engage in self-improvement activities throughout their incarceration. Program content focuses on developing interpersonal skills, behaving pro-socially in a prison environment, challenging antisocial attitudes and criminality, drug education, developing problem solving skills, success strategies and planning for release.

The protocol is delivered in a group/community format with tracked/documented sessions. Program length is typically completed over 6 months of half-day, face-to-face contact between treatment team members and participants. As of November 1, 2021, expanded eligibility criteria of the BRAVE program became effective. The purpose of this expansion beyond the original target population reference in policy for BRAVE programs (PS5330.11) was to allow for an increase in the offering of appropriate programming to many more AICs and to help meet the purpose of the First Step Act and mission of the Bureau of Prisons. The AIC must meet the following: AIC is 40 years of age or younger; AIC has a sentence of at least 36 months remaining to serve; AIC is a first time Bureau commitment; and AIC is within the first 18-months of his sentence.

## CREDITED HOURS

350

## LOCATIONS

| | | |
|---|---|---|
| FCI Beckley (M) | FCC Victorville (M) | FCI Greenville (M) |
| FCI EL Reno (M) | FCI Williamsburg (M) | |

Key: (L) = Low; (M) = Medium; (H)= High

## NEEDS

Will change the antisocial peers and cognitions need from YES to NO.

## RISK

Will decrease risk points for the category program completions.

## AUTHORIZED FACILITATORS

To ensure program fidelity and proper credit, BRAVE must be delivered by Psychology Services. Please refer to **PS 5330.11, Psychology Treatment Programs,** for further guidance.

**EXHIBIT TWO**

Vincent041

# SKILLS PROGRAM (RESIDENTIAL)

## DESCRIPTION

The Skills Program is a unit-based, residential treatment program designed to improve the institutional adjustment of those who have intellectual and social impairments. Individuals with lower IQs, neurological deficits from acquired brain damage, fetal alcohol syndrome, autism spectrum disorder, and/or remarkable social skills deficits are more likely to be victimized and/or manipulated by those more sophisticated. As a result, they may be placed in the Special Housing Unit for their protection or may have frequent misconduct reports because of their limited decision-making skills. Only those who have a demonstrated need for the Skills Program and who are appropriate for housing in a medium or low security facility will be considered for participation.

Through using a modified therapeutic community (MTC), the Skills Program employs a multi-disciplinary treatment approach aimed at teaching participants basic educational and social skills. The goal of the program is to increase the academic achievement and adaptive behavior of this group of individuals, thereby improving their institutional adjustment and likelihood for successful community reentry. Some participants may become Mental Health Companions; these individuals are carefully screened and serve as supports and role models for Skills Program participants.

## CREDITED HOURS

500

## LOCATIONS

FCI Coleman (M)     FCI Danbury (L)

Key: (L) = Low; (M) = Medium

## NEEDS

Will change the antisocial peers and cognitions needs from YES to NO.

Will address but not change the mental health need.

## RISK

Will not impact risk points.

## AUTHORIZED FACILITATORS

To ensure program fidelity and proper credit, the Skills Program must be delivered by Psychology Services. Please refer to **PS 5330.11, Psychology Treatment Programs**, for further guidance.

**EXHIBIT THREE**

Vincent042

# CHALLENGE (RESIDENTIAL)

## DESCRIPTION

The Challenge Program is a cognitive behavioral, residential treatment program developed for male offenders in the United States Penitentiary (USP) settings. The Challenge Program provides treatment to high-security offenders with substance use problems and/or mental illnesses. Programming is delivered within a modified therapeutic community (MTC). Participants interact in groups and attend community meetings while living in a housing unit separate from general population. The Challenge Program is designed to facilitate both favorable institutional adjustment and successful reintegration to the community via treatment of substance use disorders and/or treatment/management of mental illnesses. Program content focuses on developing interpersonal skills, behaving pro-socially in a prison environment, challenging antisocial attitudes and criminality, improving communication skills, developing problem solving skills, violence prevention, recovery maintenance, success strategies, and planning for release.

The Challenge Program is available in 11 high security institutions. Offenders interested in this program may participate at any point during their sentence; however, they must have at least 18-months remaining on their sentence. The duration of the program varies based on personal need. An offender must meet one of the following criteria to be admitted into the Challenge Program: A history of drug use as evidenced by self-report, Presentence Investigation Report (PSI) documentation or incident reports for use of alcohol or drugs; A serious mental illness as evidenced by a current diagnosis of a psychotic disorder, mood disorder, anxiety disorder, or severe personality disorder.

## CREDITED HOURS

500

## LOCATIONS

| | | | |
|---|---|---|---|
| USP Atwater | USP Beaumont | USP Big Sandy | USP Lee |
| USP Canaan | USP Coleman I & II | USP Hazelton | USP Tucson |
| USP McCreary | USP Pollock | | |

## NEEDS

Will change the anger/hostility, antisocial peers, cognitions, and substance use need from YES to NO.

Will address but not change the mental health need.

## RISK

Will decrease risk points for the program completions category.

## AUTHORIZED FACILITATORS

To ensure program fidelity and proper credit, the Challenge Program must be delivered by Psychology Services. Please refer to **PS 5330.11, Psychology Treatment Programs**, for further guidance.

## EXHIBIT FOUR

Vincent043



Jack Thomas Donson
Email: jack@bopera.org
Telephone (212) 461-2252 B.
(570) 687 6829 C. (Preferred)

**Personal Information**
Education: BS-Sociology/Anthropology
MS-Criminal Justice

**Personal Statement**

I have worked directly with incarcerated people for over 38 years at the county, state and federal levels. I educate and support the federal justice community on BOP policy and process to obtain better outcomes in representation, advocacy and legislation. In 2011, I retired from the BOP and founded "*My Federal Prison Consultant*", LLC, after witnessing decades of exploitation of incarcerated people and families by high priced and uninformed prison consultants. This exploitation has exacerbated under the First Step Act because the lack of BOP transparency which fosters exploitation.

During most of my BOP career, I managed caseloads within the trenches of the prison system as a Correctional Treatment Specialist.  I also served in administrative capacities (CMC/Unit Manager/Camp Administrator). I have conducted facility audits, participated in policy writing work groups, oversaw programs and trained case managers in classification and correctional programs. My perspective is unique and derived from directly applying policy in various prison environments including Pre-trial ( administrative/high security), Minimum, Low, Medium, & Witness Security units. I received three national awards during my career and over thirty other performance awards.

After working for twelve years in the private sector, I saw a profound need for a more educated justice community regarding BOP issues and I formed The Federal Prison Education and Reform Alliance (501C3) where I serve as the Executive Director. The organization is a primary stakeholder focused on BOP issues, supporting and educating federal defenders while directly supporting people in prison. Our organization conducts training around the country for Federal Defenders, Judges and the Administrative Office of the US Courts.

I have served pro bono for several non-profit organizations helping marginalized populations and their families navigate the prison system. (FedCURE/Out4Good/Choosing Integrity) I am a member of the Corrections Committees of the National Association of Criminal Defense

Vincent044

Lawyers (NACDL) and the American Bar Association (ABA). I have testified in federal district courts throughout the United States and the United Kingdom. For several years, I was a lecturer at the university level and have taught several courses including one entitled "The American Prison."

My most rewarding government contract work as an expert is supporting post-conviction petitions by submitting formal declarations and testifying for juvenile and young adult lifers sentenced in the D.C. Superior Court regarding the Incarceration Reduction Amendment Act (IRAA) and the Second Look legislation.

My passion is federal prison reform and believe that many proactive reforms can be accomplished under the existing policy and statutory framework through leadership, accountability and transparency.

I have a pulse on the agency from working on both sides of the system and my knowledge of BOP policy, process and culture is extraordinary.  My analytical ability in combination with my practical experience provides me with insights that are advantageous for clients, attorneys, legislators, the media and reform organizations. I have appeared on several national television and radio programs as a commentator and have been quoted in national print media. I have authored  chapters in two ABA Books on mental health issues and articles in the Federal Sentencing Reporter, The Hill as a  "Opinion Contributor" and Bloomberg Law Insights as an "Outside Editor."

**Current Work Experience**

***The Federal Prison Education and Reform Alliance-*** Executive Director -Non-profit providing education and support to the federal justice community and direct services to the incarcerated. July 26, 2023-Present  www.bopera.org

***My Federal Prison Consultant****, LLC*- President& Founder, supports counsel, clients and families on both technical policy issues and general prison support on all areas of the BOP. I testify around the country on BOP issues relevant to mitigation. July 2011-Present www.mfpcllc.com

**Prior Work Experience**

***Prisonology***, VP- Operations & Co-founder, Consulted, testified and developed CLE's which were delivered to federal defenders, judges and CJA panel attorneys. September 2014- Feb. 2022.

***FedCURE***, Director of Programs and Case Management Services, Assist the incarcerated and their families relative to federal prison issues, pro bono via a designated BOP liaison in the central office. July 2011- June 30, 2023. www.fedcure.org  (volunteer)

***Out4Good,*** *LTD,* Executive Director- In charge of developing the "Correcting Corrections in America initiative", April 2013 to April 1, 2024.  Stepped down to a regular board member position to focus on PERA.    www.out4good.org

*Marywood University,* Lecturer PA- Criminal Justice Professor- courses entitled: "Community Corrections," "Shadow and Service" and "The American Prison."  January 2013-January 2019

*Federal Bureau of Prisons*, Correctional Treatment Specialist & Case Mgt. Coordinator- I was responsible for the counseling, classification, inmate discipline and re-entry. I coordinated institution programs and trained staff in classification & correctional programs.

- Special expertise working with high profile organized crime figures, the Witness Protection  (WITSEC) program & white-collar crime offenders.
- Alternate Case Management Coordinator 1991 to 2011
- Assignments (TDY) in the Regional Office, Philadelphia, PA. (CIM Coordinator/Correctional Programs), New York City Community Corrections Office (processing designations and halfway house referrals) & several National (DC) policy writing work groups.
- Annual Training Instructor in the areas of security designation/classification, Central Inmate Monitoring (CIM,), FOIA/Privacy Act & Victim Witness program.
- Member of Hostage Negotiation Team
- Received 3 National Awards for Excellence in Administration & Detention Procedures, National Correctional Treatment Specialist of the Year &  Excellence in Training Award.
- Taught Institution familiarization orientation to new staff & was assigned as a mentor for college interns and newly appointed case managers and counselors.
- Held assignments as Camp Administrator, Case Management Coordinator, Unit Manager and Assistant Case Management Coordinator.
- Liaison for US Parole Commission, US Marshals, FBI and ICE
- Worked in minimum, low, medium, administrative (including high security) & Witness Security (WITSEC) units.

*Commonwealth of Pennsylvania,* Probation and Parole Officer- Supervised a caseload of adults and juveniles. Appeared in court on a weekly basis, prepared pre-sentence reports, submitted parole recommendations to the court, provided community supervision of offenders and managed the work release and ARD programs. ( Internship with Scranton District Office of the PA Board of Probation and Parole).

 **Army National Guard,** (E-5) Easton, PA 1986-1995
- **Military Police** (MP-95 Bravo), Ft. McClellan, AL
- **Stinger Missile Gunner**   (16 Sierra), Ft. Gordon, Ga.

**Education**

Marywood University, Scranton, Pennsylvania
- **Master of Science in Criminal Justice** 1997 (Concentration in Public Administration)

East Stroudsburg University, East Stroudsburg, Pennsylvania
- **Bachelor's Degree in Sociology/Anthropology** 1985

Vincent046

**Awards**
- 1998 National Community Corrections Award
- 1990 National Correctional Treatment Specialist of the Year
- 1991 National Excellence in Annual Training Award
- I received thirty-two other monetary personal achievement awards.

**Other Activities/memberships**

*Choosing Integrity*, Board Member (2018-2025) https://www.choosingintegrity.org/about/

- Testified on Capitol Hill to the Colson Task Force on Federal Corrections
- AOUSC Trainer -Defender Investigator and Paralegal Seminar-Houston TX Winning Strategies Seminar-BOP Mental Health-Austin, TX
- Authored Article on BOP Restrictive Housing in the Federal Sentencing Reporter
- Authored Chapter's in ABA Publications on Autism Spectrum Disorders (2019) & Suicide and Its Impact on the Criminal Justice System (2021)
- Regularly provides training on federal prison issues to federal defenders, Judges & for the AOUSC
- Numerous National media outlet appearances for commentary (CNBN/Fox/CNN)
- NACDL Corrections Committee since 2011
- ABA Corrections Committee 2012- Chaired Standing sub-committee on BOP Policy
- Monthly contributor to the Sentencing Partners Newsletter from Joaquin & Duncan
- Finance Committee Chair-United Methodist Church
- Authored OP Eds in The Hill regarding BOP issues
- Member of the U.S. Ombudsman Association (USOA)
- Member of the PA Prison Society
- Overall offender advocacy & general federal prison & legislative reform efforts
- Hiking, Fishing, Leisure Travel

# References, testimonials and award letters are available upon request.

4

Vincent048



Dear Judge Hodge,

My name is Keyanna Vincent and I am Keyonn Vincent's sister. I would like to tell you a little about my brother. We have been through so much together and are as close as two people can be. We are really more like twins and I know his intentions. I really don't think anyone knows him like I do.

Keyonn and I were just babies when we got removed from our mother's home. She was heavily addicted to drugs and we were not receiving good care. We were seven siblings and we all got separated, except me and Keyonn. We got to stay together. Everyone else went to live with relatives. It wasn't ideal, but it was way better than what Keyonn and I got. We bounced around but eventually went to live with the Vincents, our foster "family" and despite our complaints about how we were mistreated by them, no one came to save us. Worse, they were allowed to adopt us. No one took our complaints seriously until Mr. and Mrs. Vincent took to me to a clinic way out in Bucks County to force me to have an abortion. The father of that child was Marc Vincent, my supposed "father." I was 15. The abuse had been going on for years.

The Vincents treated us worse than dogs. At first, we visited with our family at Children's Choice but that stopped when we were 8 or 9. We used to beg the Vincents to let us see our family, but the Vincents told us they didn't want to see us because they didn't love us. That was a lie, but we were just kids and thought it must be true. Why else would they leave us with these monsters? They kept us from our biological family while telling us that we were not really their kids. They didn't have to tell us because they showed us in so many ways. They were abusive and cruel to us, but not to their own biological sons. They did things together as a family and left us home alone. We got our butts whooped with wooden spoons, wire brooms, and belts. Mr. Vincent used to beat my brother unconscious and then send him to bed without ever seeing a doctor. My brother got locked in the bathroom in the dark if he cried because "boys shouldn't cry" even if he is only kid. They cut his hair as punishment, shaving his head until he was bald. The kids at school already made fun of us for our dirty clothes that didn't fit, but with that bald head the kids were brutal. Once we were adopted it was even worse because no one was watching us. They told us we were "theirs" now and they could do what ever they wanted to us.

The "mother" Maria took pride in how bad she beat us. Keyonn tried to protect me but once Maria saw that Keyonn would take all the abuse in the world just to spare me, she began to punish him by beating me and making sure Keyonn knew it was his fault. So Keyonn started to run away from home when he was like 11 years old because he thought they might stop hurting me. Keyonn always cared for me more than he did himself. At 13, Keyonn left for good. He was sleeping in cars and getting by any way he could. The Vincents did not even look for him. It just made it easier for Mr. Vincent to rape me without getting caught. When Mr. Vincent got charged for what he did to me, they finally got us out of there. Keyonn was long gone, but they found him and separated us, just when I needed my brother more than ever. We thought we would get to go back to our real mother, but they just put us right back in the system that already failed us. At least when we were with the Vincents I would see Keyonn at school, but after we got separated, he was lost to me. He was placed briefly with a lady outside Philly, but then he wound up homeless again. He has pretty much been homeless since age 11, fending for himself in survival mode. Anyone who helps Keyonn survive one more day, gains his trust and Keyonn thought was his friend.

Keyonn struggles started early. He couldn't do basic things other kids seem to just pick up along the way. He didn't really speak until he was around 6 years old when we started school. I used to speak for him. He failed first grade so we were actually in the same grade. It takes a while for Keyonn to learn and most people just lose patience with him. But Keyonn really likes to learn. He reads a lot a keeps a journal of things he reads that mean something to him. When we were kids, I used to teach him. I taught him to tie his shoes. I helped him with schoolwork. I didn't get frustrated with him. The problem wasn't Keyonn. The problem was the teachers did not know how to teach him and were not interested in learning, even though I tried to show them. Keyonn would do dumb things at school for attention because he didn't get any at home. If they had just been kinder to him, he would have performed better. But instead they just punished him, as if he didn't get

enough of that at home.

If you spend a minute with Keyonn you see his childlike nature - he comes off pure and naïve.  It is not hard to spot. Keyonn is too trusting for his own good and too thirsty for approval, especially from older men. He is still searching for a dad to love him unconditionally, and that is like honey to a bee to the men out here willing to pretend to be his daddy in order to use his kind heart against him. Keyonn doesn't see wrong in nobody. He is too forgiving. He doesn't feel revenge, not even when he is alone with his own mind. He really wants the best for everyone and will forgive anything. He just cannot hold a grudge. Someone would beat him to a pulp and the next time Keyonn sees him he's like "hey remember that time you beat me up" and bust out laughing like they were just old friends. He even treated Mr. Vincent like he was a decent father, making excuses for him. But I can't expect Keyonn to hate anyone, it is just not in his nature. So I don't get offended.

Keyonn gets in trouble because he wants to please everybody and take care of them in the ways no one has ever taken care of him. Living on the streets, people take advantage of that.

Keyonn needs protection, not punishment.

Keyonn is a child in grown man's body and no one would send a child to penitentiary and expect him to survive. I honestly cannot see what good comes of keeping Keyonn in prison where he will just be abused and suffer more trauma. He will meet more people who will take advantage of him and teach him terrible things.  In a perfect world Keyonn would have had parents who spotted his challenges early and got him the help he needed to thrive and who could provide a supportive home for him. Instead he was thrown to the wolves and abused more than any person should have to bear. And still his heart stays pure. He is truly the best of us. I know that is hard to accept given the reason we are here. But my brother would not hurt a fly and he has been sick with guilt over what happened, and traumatized by his memories of the event. I promise you Keyonn did not see that coming. He worries about the Patro family and has tried to do right by them. He has tried to hurt himself more times than I am sure I know about. He tries to get help at the prison, but they don't have patience for him either.

After years of searching, our family is all together now. It is sad that Keyonn does not get to be with us this family he always wanted. But we are here for him and will do our a part to help.

Judge Hodge, I hope you will use your wisdom and creativity to find a better solution for Keyonn where he can be kept safe and learn what he needs to do to make better choices.

Thank you,

Keyanna Vincent

5

Vincent051

From: **latanya bradsher** ████████████████████ m
Subject: Re: Letter for Keyonn Vincent
Date: December 15, 2025 at 7:52 PM
To: jill@zedekpartners.com



Dear Judge Hodge,

My name is Latanya Bradsher Robinson and I am Keyonn's eldest sister.

When Keyonn and Keyanna were born, I was already mostly living with my aunt. My mother struggled with her addictions and it was particularly bad when they were born. I cared for them like they were my babies. When they finally removed the rest of the kids from my mother's care, Keyonn went to live with relatives on our father's side, but my aunt rescued him from there. He was so sick. He was vomiting and couldn't keep any food down. This must have been going on for a while because Keyonn was so skinny and his stomach was distended from lack of nutrition. He lived with us for a while, but DHS in all its wisdom decided our home wasn't big enough and they sent Keyonn and Keyanna to live with strangers. I cried everyday worrying about how abandoned and alone they must have felt. I had no idea then just how bad it would be for them in that house of horrors. They endured abuse - sexual and physical. The Vincents tried to hide their abuse by cancelling their visits with the rest of the family. Years passed and we did not hear from them. I prayed every night they were ok, it was a trauma for me knowing they were with a family they didn't know.

Then I started seeing Keyanna walking home from high school and I ran up to her to introduce myself. She didn't even recognize me. That broke my heart. But that was the beginning of our healing. I pulled together all my siblings and my mother and we went and visited Keyonn at Friends Hospital. He checked himself in there because he was afraid he might kill himself. I then learned all about how hard their lives had been, how badly they had been treated, how unloved they felt. I also learned that Keyonn had been living on the streets for years, fending for himself and that his supposed "family" never even bothered to look for him.

This situation would be terrible for anyone, but if you have met Keyonn you probably understand why it was so much worse for him. Keyonn is more like a child of about 8 years old. I realized that when my own child turned 8. There are so many similarities about how they respond to the world--with excitement and wonder, so trusting and somehow always surprised. He loves with his whole heart like someone who has never been hurt, but we all know he has. And like a child he is so open with his feelings, telling everyone how much he loves them probably because he wishes someone would tell him the same thing. He is always looking for safe place and someone to protect him. Theres a lot of people who see that as an invitation to take advantage him. But Keyonn will always forgive them.

So I cannot imagine what life on the streets was like for someone who has the mentality of a young boy much less what life in prison has been like. He doesn't tell me what he has been through because Keyonn also wants to be a man and protect us so he carries this alone.

Even after we reunited, Keyonn would still run away. No matter how many times we told him that we are family and we want to help him, Keyonn cannot shake that feeling of being a burden - a feeling that has grown over a lifetime of rejection.

As adults, we have all had therapy and counselors to deal with our trauma. We got to figure out how to take care of ourselves. We have grown our relationships and we are healing. All except for Keyonn. He was still a child when he was arrested for this horrible crime and has missed the healing journey we have been on. I hope this letter helps you understand that there was no way Keyonn knew what was going to happen that day. He has been so traumatized by it himself. Keyonn needs a lot of support and now that we are older, I know we can help him to get it. I worry that he will be so badly abused in prison he will be worse off than when he went in. I hope when you sentence Keyonn you will take this into account and help make sure that Keyonn gets the support he needs and please rest assured that his family loves him, understands him, and will support his entry back into the community with all we have.

Sincerely,

Latanya Bradsher Robinson

Vincent053

6

Vincent054

To whom it may concern

My name is Alex Hiatt and I worked as Keyonn Vincent's CUA (Community Umbrella Agency) case manager while he was in the custody of Department of Human Services in Philadelphia. I was assigned Keyonn's case in 2016 when he was 13 and became a dependent youth for the 2nd time in his life. His adoptive parents, went on a Caribbean cruise without him, and during this time he was arrested for shoplifting. As his guardians were out of the country, he was sent to a group home. He never returned to the Vincent's and they never visited him or wanted him back. Throughout his childhood, Keyonn never had a responsible adult consistently care for him. Before the start of his freshmen year of high school, Keyonn has been on his own. And the Vincents didn't even bother to enroll him.

Keyonn stated to me that he was physically and emotionally abused by his adoptive parents. He shared a room with his sister Keyanna, where she was repeatedly sexually assaulted by their adoptive father Marc Vincent for several years. I became Keyonna's caseworker and once we developed a rapport, she first disclosed the sexual abuse to me and how her adoptive father took her to a clinic for an abortion. Marc Vincent was later tried for these crimes against Keyanna. I always suspected that Keyonn had also been sexually abused. The bond I observed between Keyonn and Keyanna was incredibly strong. Even if he was not raped by Marc, the effect was nearly the same.

Keyonn and Keyanna came into this world with substances in their system, neglected by a mother and father who couldn't care or adequately love their children, removed by the state, and placed with a couple that withheld love and inflicted unspeakable abuse and subsequently removed by the state all prior to the age of 16. They never had a family who provided love and support, and they never had a chance.

This murder of Siboram Patro is an utter tragedy and my thoughts and compassion are extended to his family. They certainly deserve justice for the loss of a loved one and I believe those involved in his death should be held appropriately responsible.

I understand that the sentencing judge can consider factors such as a person's life history when fashioning an appropriate sentence. As Keyonn's former caseworker I think I can offer some background that you may find helpful.

When I met Keyonn, he had already been in the system his entire life. He was taken from his home as a young child and adopted by a foster family who both abused and neglected him and his sister. Keyonn had the misfortune of having two sets of parents severely mistreat him. His foster placement was supposed to be one of safety and refuge. Instead, unspeakable cruelties were inflicted on him and his sister. The trauma Keyonn experienced in his youth led to mental health concerns and hospitalizations. It is no wonder that Keyonn frequently ran away. Keyonn was a child who avoided things that were hard, scary, or hurtful, and he was very afraid of Marc. So much so that he preferred to be out roaming the street without money or security than in that household.

Even though the Vincents formally adopted Keyonn, they never engaged in his mental health treatment. They never visited him while he was hospitalized or placed in group homes. Keyonn received sporadic mental health treatment because of multiple placements and frequent elopements. However, without any family support his treatment was never consistent or emphasized as important. The continued neglect and abuse served to worsen his condition and he ran away frequently to escape. But once I knew where to look, it wasn't difficult to find him. I remember he was living in the Frankfurt Terminal for a while.

As a child runaway Keyonn was uniquely vulnerable to the dangers of his environment and he took up shoplifting to support himself on the street. He has a history of shoplifting arrests. He does not have any history of violence or aggression and I have never witnessed those qualities in him. Keyonn was always just trying to survive another day and followed those who promised to teach him how. Watching the horrific security camera footage in this case, I was not surprised to see Keyonn appear shocked, scared, and without a

weapon. I have no doubt he was very traumatized by how these events unfolded.

As a social worker, we are trained to understand how trauma impacts a child's development and we now know how important it is to use trauma informed practices when dealing with youth in the system. But that was not always the case and unfortunately Keyonn slipped through the cracks of society. He never once received the emotional or material support to which he is entitled. I am now a therapist, and I know Keyonn would have greatly benefitted from early interventions. However, he is still young and there are evidence-based practices available that can still help Keyonn overcome his trauma and stay safe. But a good treatment plan requires consistency, an environment where the patient feels safe, and treatment must be adapted to accommodate individual differences in cognitive development. There is no one-size-fits-all solution, rather there are methods which are better suited for Keyonn than others and I hope any sentence will provide for this type of individualized treatment.

For the first 21 years of his life, society failed Keyonn Vincent. I am not excusing his actions that led to the harm of another, but I do hope this information helps you formulate a sentence that is appropriate to Keyonn's role in the crime, takes into account the conditions that helped put Keyonn in this position and most importantly offers Keyonn an opportunity to receive ongoing treatment and support from society for the first time in his life.

Respectfully,

Alex FG Hiatt

**CERTIFICATE OF SERVICE**

I, Margaret M. Grasso, Esquire, certify that I have delivered a copy of the foregoing Sentencing Memorandum to Assistant United States Attorneys Christopher Parisi and Amanda McCool via electronic mail.

LAW OFFICE OF MARGARET M. GRASSO

BY: _____

**MARGARET M. GRASSO, ESQUIRE**
**Attorney for Defendant Keyonn Vincent**

March 31, 2026